UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

EVELINE GOINS

v.                                          CASE NO. 3:02CV 1537 (AVC)

MARVIN BRANDON                              July 24, 2004

PLAINTIFF'S LOCAL RULE 56(a) 1 STATEMENT

Following are the material facts as to which there is no genuine issue to be tried:

1. Plaintiff is a consumer within the FDCPA. Plaintiff's affidavit; stipulated in Planning Report Doc. No. 10.

2. Defendant Brandon is a debt collector within the FDCPA. Admitted in Answer to ¶ 4; Stipulated in Planning Report Doc. No. 10.

3. Defendant's office sent a letter dated Nov. 22, 2001 to plaintiff. Plaintiff's affidavit, attached hereto.

4. Defendant did not review plaintiff's account or make the decision to send the letter. Brandon Dep at 22-25 attached.

5. Defendant did not have copies of the checks at issue. Brandon Dep. at 54-56 attached.

6. Defendant did not make the decision about the amount demanded in the letter. Brandon Dep. at 34-35 attached.

7. Defendant did not intend to sue at the time the letter was transmitted. Brandon Dep. at 28-29 attached.

8. Brandon is not admitted to practice in Connecticut. Brandon Dep. at 33 attached.

9. The form letter at issue was sent to plaintiff intentionally. Boyajian Dep. at 36-40.

THE PLAINTIFF


BY____/s/ Joanne S. Faulkner___
JOANNE S. FAULKNER ct04137
123 Avon Street
New Haven, CT 06511-2422
(203) 772-0395
j.faulkner@snet.net


This is to certify that the foregoing and attached was mailed on July 24, 2004 postage prepaid, to:

Jonathan D. Elliot
P. O. Box 763
Southport CT 06490

____/s/ Joanne S. Faulkner____
Joanne S. Faulkner

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

EVELINE GOINS

v.  CASE NO. 3:02CV 1537 (AVC)

MARVIN BRANDON  December 2003

## AFFIDAVIT

1. I am the plaintiff in this action under the Fair Debt Collection Practices Act and CUTPA. I am over the age of 18 and believe in the obligation of an oath. I make this affidavit in support of my motion for default judgment.

2. I received the attached letter dated November 22, 2001, from defendant seeking payment on personal returned check(s) I supposedly wrote to the clothing merchant.

3. If I bought anything from the merchant, it was for personal, family or household use.

I verify under the penalty of perjury that the foregoing is true and correct.

Dated 12/10/03

Eveline Goins

Marv Brandon
2 Broad Street 6th Floor
Bloomfield NJ 07003-2591

ADDRESS SERVICE REQUESTED

**JBC & ASSOCIATES, P.C.**
Attorneys at Law
2 Broad Street 6th Floor
Bloomfield NJ 07003-2591
Telephone: (800) 655-9107  Fax: (732) 744-1112

November 22, 2001

Marv Brandon
*Attorney at Law*
2 Broad Street 6th Floor
Bloomfield NJ 07003-2591

A26044-3    257129    8111
Eveline J Goins
45 3rd St
New Haven CT 06519-2715

File #: A26044

***Detach Upper Portion And Return With Payment***

Re:        **Marshalls-Marmax**
File #:    **A26044**
Balance:   **$4811.36**

Dear Eveline J Goins:

It is unfortunate that you have refused our offer to voluntarily make restitution for the above-referenced "returned" check(s) you wrote to our client(s).

We see no reason or excuse why you would avoid responding to our attempts to contact you. If you don't believe you wrote the bad check(s) in question, and this is a matter of fraud or a case of mistaken identity, you must provide us with a copy of the police report obtained from your local authorities and an affidavit of forgery from your bank. Otherwise, we will assume that the obligation is valid and all information obtained at the point of check issuance is accurate.

Be advised our records reflect you may have used your drivers license and therefore you may have authorized our client to inquire as to your identity and location in its efforts to recover the funds due. Before your state's motor vehicle division is contacted regarding such information, we would like to confirm the following:

1. The drivers license number (if any) associated with this check is accurate; and
2. You personally used your license when issuing the dishonored check.

**Please note the information we have establishes that a person using your name, address and/or drivers license obtained merchandise, presumably with fraudulent intent, by issuing a bad check(s) to our client(s).**

Unless we receive immediate payment of $4811.36 or sufficient documentation that relieves you of this obligation, we reserve the right to use any and all information we have obtained in further civil or criminal proceedings.

If you need further instructions, you may contact **Lori Brown S. xp at 800-655-9107**.

Be guided accordingly.

Very truly yours,

*Marv Brandon*

Marv Brandon, Esq.

This is an attempt to collect a debt by a debt collector. Any information obtained will be used for that purpose.

| NY Office | California Office | MA Office |
|---|---|---|
| 11 Penn Plaza, 5th Floor | 270 N Canon Drive Suite 120 | 306 Dartmouth Street |
| New York NY 10001 | Beverly Hills CA 90210 | Boston MA 02116 |

4SDJBCA013

GOINS v. BRANDON

September 5, 2003

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2                 DISTRICT OF CONNECTICUT
 3
    ------------------------------x
 4
    EVELINE GOINS,                :
 5
            Plaintiff,            :   Civil Action
 6
        -versus-                  :   3:02CV 1537 (AVC)
 7
    MARVIN BRANDON,               :
 8
            Defendant.            :
 9
    ------------------------------x
10
11
12
13
14          Deposition of MARV BRANDON, taken
15  pursuant to the Federal Rules of Civil Procedure,
16  at the law offices of KLEBAN & SAMOR, 2425 Post
17  Road, Southport, Connecticut, before Lynn
18  Muscatello, a Notary Public in and for the State
19  of Connecticut on September 5, 2003, at 1:12 p.m.
20
21
22
23
24
25
```

SANDERS, GALE & RUSSELL                          (203)624-4157

Page 22

1  A. That's correct.
2  Q. Then you make the phone call?
3  A. Yes.
4  Q. And are you able to read the consumer's
5  records on your computer screen?
6  A. Yes. The information we have on the
7  file. I bring the file up.
8  Q. And are you able to enter information
9  into that computer record?
10 A. Yes.
11 Q. What type of information could you enter?
12 A. I would, if the phone call was important,
13 I would enter what the phone call was about.
14 Q. Would you enter the date and time or is
15 that all?
16 A. The computer does that automatically.
17 Q. Would you enter your name or initials?
18 A. No. The computer does that.
19 Q. So the computer knows what terminal is
20 entering the information automatically; is that
21 correct?
22 A. I believe so, yes.
23 Q. Do you personally ever decide to send
24 letters to debtors?
25 A. Well, are we talking about collection

Page 23

1  letters?
2  Q. Yes.
3  A. Usually Jack Boyajian makes that
4  decision. He reviews the accounts.
5  Q. How many accounts would you have in your
6  office at any given time?
7  A. I have no idea. I couldn't even
8  speculate on that.
9  Q. If you have a hundred collectors how many
10 accounts on average would they be working; do you
11 know?
12 A. I have no knowledge of the number of
13 accounts or number of accounts that a collector
14 would have.
15 Q. If you entered this information on the
16 screen and saw that a letter should go out to
17 somebody, perhaps to the attorney, do you have
18 that authority to create such a letter?
19 A. If I'm corresponding with an attorney,
20 yes. I usually deal with the attorneys.
21 Q. So you don't have to go to Mr. Boyajian
22 for review, can I send this letter out to attorney
23 so and so?
24 A. It would be very unusual.
25 Q. What is the process to print out a

Page 24

1  letter?
2      (Discussion off the record.)
3  A. You just get into Micro Soft Word and
4  type in a letter, or I have Karen Hopkins print it
5  for me.
6  Q. So it goes directly out of your own
7  office?
8  A. Or I give it to Karen, and she prints
9  it. I sign it, and she sends it.
10 Q. Now, with regard to the form collection
11 letters, how do those go out?
12 A. I'm not too familiar with the process,
13 but the information comes in from the clients.
14 And Jack Boyajian would review it. And he would
15 determine if we have sufficient information and if
16 the account is -- what letter should be sent to
17 the debtor. He makes that determination
18 firsthand. And the letter is sent out if we have
19 enough information and if we verified the
20 information as to where the debtor lives, how much
21 is the amount, we have sufficient back-up
22 information. And he would make that determination
23 usually.
24 Q. So he would sit at the computer screen
25 and push the buttons to have a letter generated?

Page 25

1  A. Yes. Initially he reviews it, yes.
2  Q. But he doesn't send out every letter?
3  A. I don't know. I've never done it with
4  him.
5  Q. Does a collector have authority to send
6  out a letter?
7  A. To my knowledge, no.
8  Q. Are letters sent out on an automatic time
9  basis?
10 A. I'm not familiar with the process of how
11 it's actually done.
12 Q. You yourself don't review any of the
13 letters that are sent to debtors; is that correct?
14 A. That's correct. Mr. Boyajian reviews
15 them.
16 Q. Your letters are printed in Michigan; how
17 does that process take place?
18 A. I don't know. I would assume that the
19 information is given to the printer by computer
20 tape or disk.
21 Q. Does JBC have form letters with
22 fill-in-the-blank variables?
23 A. I can't comment on that. I don't know.
24 Q. Is it something Mr. Boyajian would know?
25 A. I assume, yes.

GOINS v. BRANDON

September 5, 2003

Page 26

1 Q. Is there anybody else that would know?
2 A. Anybody else who would know?
3 Q. Yes.
4 A. I don't know.
5 Q. When you're observing the collectors I
6 presume you can see them as you come in and out of
7 the office; are they mostly on the telephone?
8 A. Oh, yes.
9     (Plaintiff's Exhibit B entered for
10 identification: A one-page sample letter.)
11 Q. That was produced by you in discovery as
12 a sample of the first letter that goes out from
13 JBC; is that correct?
14 A. Yes. It has the validation clause at the
15 bottom.
16 Q. And that has your facimile signature on
17 it; is that correct?
18 A. That's correct.
19 Q. That is not your real signature?
20 A. That's correct.
21 Q. Up at the top above the area that's
22 blocked out there is a serial number. Looks like
23 001CT?
24 A. Yes.
25 Q. Does that indicate it was a letter

Page 27

1 drafted to go to a Connecticut resident?
2 A. I can't tell you. I don't know to my
3 knowledge. I assume CT means Connecticut.
4 Q. Did you draft this letter?
5 A. I may have drafted it in conjunction with
6 Mr. Boyajian.
7 Q. Did you research the contents of the
8 letter?
9 A. You'll have to explain that question.
10 Q. There is a reference in the second
11 paragraph to a Connecticut general statute?
12 A. Right. I don't know if I did it or
13 Mr. Boyajian did it, but I assume that one of us
14 did it because it's factual.
15 Q. You don't remember doing it yourself?
16 A. No.
17 Q. The middle paragraph says you're liable
18 for the full amount of each check plus a service
19 charge of twenty dollars per check. Who imposes
20 the twenty dollars?
21 A. I don't understand the question.
22 Q. Does your office add the twenty dollars,
23 or does the creditor I guess who's blocked out add
24 the twenty dollars?
25 A. I don't know whether it's done by statute

Page 28

1 or that's a twenty dollar fee that we may be
2 entitled to.
3 Q. Do you know whether your office adds the
4 twenty dollars or whether it's already added when
5 you get the account?
6 A. Oh, I believe we add it.
7 Q. Your office adds the twenty dollars?
8 A. I believe so.
9 Q. The second sentence says if you do not
10 make payment you may be sued to recover payment.
11 It looks like the total amount here is a hundred
12 thirty-five dollars and sixty-three cents. Has
13 Mr. Boyajian made the decision to sue when this
14 letter goes to the consumer?
15 A. Has he made -- I'm sorry. Your question
16 is has he made the decision at the time? I don't
17 know. I can't comment on what his decision is.
18 Q. Well, your signature is on the letter.
19 And you have made a statement of fact that if you
20 do not make payment you may be sued to recover
21 payment. Do you intend to sue when that letter
22 goes out?
23 A. Which sentence are you alluding to?
24 Q. The second sentence, if you do not make
25 payment, second sentence in the middle paragraph?

Page 29

1 A. (No audible response.)
2 Q. This is a very long pause. Is there
3 something wrong?
4 A. No. It's up to Mr. Boyajian whether he
5 wants to sue or not.
6 Q. Okay. So when this letter goes out under
7 your letterhead you don't have any intent to sue;
8 is that correct? That's a yes or no.
9 A. Do I have the intent to sue? The answer
10 would be no.
11 Q. Let's look at the third sentence. If a
12 judgment is rendered against you in court it may
13 not only include the original face amount but
14 additional damages. It goes on to mention
15 additional damages. What is the basis for your
16 statement that additional damages could be
17 entered?
18 A. I would have to see the statute, 52565A.
19 Q. When you send that letter out are you
20 aware whether the creditor has sent out a written
21 demand for payment to the consumer?
22 A. I have no knowledge of whether the
23 creditor sent out a demand for payment or not.
24 Q. Do you know whether the creditor has a
25 posting at his place of employment about bounced

Page 30

1  checks?
2      A. Oh, the creditors have a posting at the
3  point of sale usually. I know, for instance, Toys
4  R Us has a sign stating that returned checks are
5  subject to a fee.
6      Q. Have you personally seen such a sign?
7      A. Yes.
8      Q. And how about Wilson Leather, Wilson
9  Suede and Leather?
10     A. I can't say that I've seen one for Wilson
11 Suede and Leather, but I have seen one for Toys R
12 Us. I happened to have checked it, and I know the
13 policy of the company.
14     Q. And how about Marshalls, do they have a
15 sign?
16     A. I've never looked in Marshalls, so I
17 don't know.
18     Q. The third paragraph of your letter asks
19 that the remission be made either to you or the
20 client. Do you have some arrangement with the
21 clients whereby JBC will get credit if the payment
22 is made directly to them?
23     A. I assume, yes, but I've never gone into
24 that. That would be -- somebody else would handle
25 that. That would be bookkeeping of some sort.

Page 31

1      Q. In the third paragraph also it says
2  contact Lori Brown. Who's Lori Brown?
3      A. There is no Lori Brown, per se. It's
4  somebody who uses the name Lori Brown.
5      Q. Who's that?
6      A. I don't know.
7      Q. Are your collectors grouped so that
8  somebody who asks for Lori Brown goes to a certain
9  group of collectors?
10     A. I don't know.
11     Q. Normally, if someone wanted to dispute
12 the debt they would write back to you; isn't that
13 correct?
14     A. If it's an attorney, it comes to me. If
15 it's not an attorney, if it's somebody who wants
16 to dispute the debt it would -- I'm not sure how
17 the process works.
18     Q. You don't remember yourself getting any
19 dispute letters individually from a consumer?
20     A. Very rarely.
21     Q. Would the mail room or whoever opens the
22 mail intercept the dispute letter before you saw
23 it?
24     A. If it's a debtor who's disputing or
25 requesting verification, it usually doesn't come

Page 32

1  to me. It comes to somebody else. And I'm not
2  sure who it is. I only receive the letter where
3  it's on an attorney's letterhead.
4          (Plaintiff's Exhibit C entered for
5  identification: A one-page sample letter.)
6      Q. If you'll turn to Plaintiff's Exhibit C.
7  Again, that has your facimile signature on that
8  letter?
9      A. Yes.
10     Q. And this was given to me as a sample or
11 the second letter that's sent anyway. Do you
12 recognize that?
13     A. Yes.
14     Q. There is a portion at the bottom that
15 says detach lower portion. And over in the right
16 there is a long string of numbers and letters.
17     A. I don't know what that means.
18     Q. NSDJBCA01002CT, would that indicate this
19 is a letter drafted for Connecticut?
20     A. I don't know what those letters or
21 numbers mean, but I recognize CT as Connecticut.
22     Q. The middle paragraph again refers to
23 Connecticut General Statute section 52565A. And
24 it again refers to the statutory penalties to be
25 determined by the court. Does that indicate the

Page 33

1  letter was drafted for Connecticut?
2      A. Yes.
3      Q. And what is the basis for your advising
4  the debtor that he or she may be subject to
5  statutory penalties?
6      A. The terms of the statute.
7      Q. And what do the terms of the stature
8  provide with regard to statutory penalties?
9      A. Offhand I don't know the Connecticut
10 General Statute section.
11     Q. You're not admitted as an attorney in
12 Connecticut?
13     A. I am not.
14         (Plaintiff's Exhibit D entered for
15 identification: A three-page defendant's response
16 to first set of interrogatories; Plaintiff's
17 Exhibit E entered for identification: A three-page
18 fact sheet.)
19     Q. Turning to Plaintiff's Exhibit D, and I'm
20 going to ask you to look at D and E together
21 because they both relate to the Marshalls'
22 account.
23     A. Yes.
24     Q. According to Exhibit D, there were I
25 believe seven checks issued to Marshalls in

Page 34

1  January of 1996; is that correct?
2      A. Yes.
3      Q. And I won't ask you to add them up. I'll
4  represent they amount to two thousand one hundred
5  and ninety-five dollars and fifty-four cents.
6      A. Face amount?
7      Q. Right. What figure would be appropriate
8  to send in a letter to Miss Goins that you would
9  demand in your letter when you're collecting seven
10 checks totalling two thousand one hundred
11 ninety-five dollars?
12     A. Which letter?
13     Q. Any letter.
14     A. The first letter, face amount plus twenty
15 dollar check fee.
16     Q. For each check?
17     A. Yes.
18     Q. Is there some difference in the second
19 letter as to the amount that would be demanded?
20     A. I don't know what the demand amount would
21 be in the second letter.
22     Q. Would it change?
23     A. I don't know.
24     Q. Is there a basis for increasing the
25 demand in the second letter?

Page 35

1      A. I would have to see the statute.
2      Q. Who inserts the amount demanded in the
3  letters?
4      A. I assume it's computed by Jack Boyajian.
5      Q. Would you assume that the computer
6  calculates the amount, or are you assuming that
7  someone is physically putting in an amount?
8      A. I assume it's programmed in.
9      Q. Let's take a look at Plaintiff's Exhibit
10 E, which is the fact sheet that goes with the
11 Marshalls' checks. And I only reproduced the fact
12 sheet for the first check because they're all
13 pretty much alike.
14        Do you see an entry by you anywhere in
15 those three pages?
16     A. No.
17     Q. If you look at the top of the second
18 page, down about six lines, there is an MB?
19     A. Oh, wait a minute. Let me see. Where
20 are we, second page?
21     Q. Yes.
22     A. Where do you see an MB?
23     Q. 62402 at 1102 about five or six lines
24 down from the top on the right-hand side on page
25 two.

Page 36

1      A. 62402?
2      Q. Way at the top.
3      A. I see 1102 CS31.
4      Q. Right. And is that MB on the right-hand
5  side? Is that you?
6      A. It's my initial.
7      Q. So evidently you made some entry from
8  your computer?
9      A. CS31? It's my initial. I don't know why
10 that appeared there. I can't tell you. There is
11 no information as to why it's there.
12     Q. Do you know what CS31 means?
13     A. No.
14     Q. Is there any indication of Ms. Goins'
15 driver's license on this fact sheet?
16     A. No. I don't see any driver's license on
17 this fact sheet.
18     Q. Is there any indication on this fact
19 sheet of the check number?
20     A. No.
21     Q. Is there any indication on the fact sheet
22 of the check's date?
23     A. There is no appearance of the date of the
24 check on the fact sheet.
25     Q. And how about the ABA number, which I

Page 37

1  guess is the American Banking number of the check?
2      A. I don't know. No, it doesn't appear on
3  the fact sheet.
4      Q. Where would you get that information?
5      A. The information appears on a computer
6  screen. It appears that all the information on
7  the computer screen does not appear on the fact
8  sheet. This may be because of the way the fact
9  sheet was programmed.
10     Q. What other information appears on the
11 computer?
12     A. That doesn't appear on a fact sheet?
13     Q. Right.
14     A. I don't know. I've never given it any
15 thought because I don't work with the fact sheet.
16 I work with the computer. It's very rare I see a
17 fact sheet.
18     Q. You were very particular about the check
19 numbers, the dates, the ABA number and so forth?
20     A. That was probably taken -- I can't take
21 the information off. That was taken off by
22 somebody else in the organization. I assume it
23 was taken off the computer screen. Nobody checked
24 the fact sheet.
25     Q. Who took this information off?

GOINS v. BRANDON

September 5, 2003

Page 54

1  A. The only employee who would work for that
2  firm that I know of is Jack Boyajian, but I'm not
3  sure what the relationship is. And anything I say
4  about it would be speculation.
5  Q. Is there a reason that the Roa Hutton fax
6  was used instead of the JBC fax for that
7  particular piece of paper?
8  A. Yes. Their office is next to mine, and I
9  probably just walked in and used their fax because
10 the other fax was tied up. That's the only
11 reason. I use that frequently. It's right next
12 door.
13 Q. With regard to Ms. Goins, do you have the
14 original checks?
15 A. I requested the original checks from the
16 clients. Were you provided with checks?
17 Q. No.
18    THE WITNESS: Do you have any
19 checks?
20 Q. Excuse me. You're not supposed to talk
21 to Mr. Fiano.
22 A. I requested the checks from the clients.
23 They were unable to provide checks. As far as I
24 know there may have been two or three checks that
25 they did provide, copies of them. If we had them

Page 55

1  in the file, we would be glad to provide them to
2  you. The majority of the checks are unavailable.
3  They were destroyed, lost, or we could not get
4  them from the clients.
5  Q. Could you bring a civil proceeding
6  against Ms. Goins without the checks?
7  A. We would rely on the books and records of
8  the company of the clients.
9  Q. What books and records?
10 A. The factual material.
11 Q. What factual material?
12 A. Computer, fact sheet.
13 Q. You would bring this fact sheet into
14 court that doesn't have the dates of the checks or
15 the numbers of the checks; is that what you're
16 saying?
17 A. I don't know if the court would accept
18 it, but we would have the information. We would
19 provide all the information that we would have.
20 The client may have a way of printing it out,
21 their books and records.
22 Q. And who is the client in this case?
23 A. It would be Wilson Suede and/or
24 Marshalls.
25 Q. Which client did you ask for the checks

Page 56

1  from?
2  A. I think we asked Melville for copies of
3  the checks, which is Marshalls and CVS if my
4  memory serves me right.
5  Q. When did you ask for the checks?
6  A. I asked for the checks I think as soon as
7  suit was, your first suit was commenced.
8  Q. Do you have a copy of the letter?
9  A. I think I did it by phone or fax, but
10 I'll look in the file and see.
11 Q. Would that be on part of the computer
12 record that's not been provided to me so far?
13 A. No. If it was entered, if I entered it
14 into the computer it would have showed up on the
15 fact sheet.
16 Q. If you would look at Exhibit H, CVS
17 assignment?
18 A. Yes.
19 Q. Do you recognize that document?
20 A. Yes.
21 Q. And what is that?
22 A. It's an assignment of CVS' claims to JBC
23 and Associates, Inc.
24 Q. Is that your signature on the bottom
25 left-hand side?

Page 57

1  A. Yes.
2  Q. And is that Mr. Boyajian's on the bottom
3  right-hand side?
4  A. Yes.
5  Q. This seems to be dated October of 1998,
6  which is before you started at JBC according to
7  your recollection; is that correct?
8  A. That's correct. I stated earlier.
9  Q. Did you have some relationship with JBC
10 before you were hired?
11 A. No.
12 Q. How do you account for the fact that the
13 letter is dated earlier?
14 A. I can't account for it. It may have been
15 back dated for some reason or maybe an error in
16 the year.
17 Q. Well, there is some kind of faint fax
18 marks up on the top. And they all agree it's
19 1998. It appears to be; is that correct?
20 A. Yes. It appears that was faxed to JBC on
21 October of 1998.
22 Q. Do you recall somebody asking you to
23 witness this after the fact?
24 A. No. I don't recall when this was done.
25 Q. Do you make collection guarantees to your

GOINS v. JBC                                                January 27, 2004

```
                                                              Page 1
 1   IN THE UNITED STATES DISTRICT COURT
 2   FOR THE DISTRICT OF CONNECTICUT
 3   -------------------------------x
 4   EVELINE GOINS,
 5                  Plaintiff,
 6       -versus-                    : Case No. 3:02CV 1069
                                              (MRK)
 7
     JBC & ASSOCIATES, ET AL,
 8
                    Defendants.                ORIGINAL
 9
     -------------------------------x
10
11
12
13              Deposition of JACK H. BOYAJIAN, taken
14   pursuant to The Federal Rules of Civil Procedure, at the
15   offices of Sanders, Gale & Russell, 437 Orange Street,
16   New Haven, Connecticut, before Patricia Saya, LSR No.
17   37, a Registered Professional Reporter and Notary Public
18   in and for the State of Connecticut, on January 27,
19   2004, at 10:35 a.m.
20
21
22
23
24
25
```

SANDERS, GALE & RUSSELL                              (203) 624-4157

Page 36

```
 1   and 2002.  So how many form letters did you have in 2001
 2   and 2002 directed to Connecticut?
 3        A.   Well, I don't recall exactly in either year,
 4   so I am not going to be able to answer that with
 5   specificity.
 6        Q.   Where would the records be?
 7        A.   Well, we don't retain letters that we don't
 8   use any longer in form, but if you ask me a more current
 9   question, I am sure I can respond.
10        Q    Where are the letters that you are currently
11   using for Connecticut?
12        A    They are in our system, our server.
13        Q.   Is your server at the New Jersey location?
14        A    Yes.
15        Q    Tell me the process of sending a letter, say
16   to Miss Goins.  How would a letter be generated?
17        A.   At the current time?
18        Q.   Yes.  How would a letter be generated to her?
19        A    We would identify a particular letter to be
20   sent to a particular debtor, and that letter would be
21   requested on that account, and the system would scan all
22   the accounts and see that there is a letter requested
23   for a debtor, particular letter type and letter number.
24   And then that would be transmitted.  That information
25   would be transmitted to our letter production and
```

GOINS v. JBC                                           January 27, 2004

Page 37

```
 1   mailing facility, which is outsourced, and the letters
 2   would be generated at that facility and sent out within
 3   24 hours.
 4        Q.   Is your outsource facility in Michigan?
 5        A.   I think they are, yes.  I think they are in
 6   Detroit or in that area.
 7        Q.   You said a letter would be requested for a
 8   particular debtor.  Who decides what letter is
 9   requested?
10        A.   Generally, I do.
11        Q.   If a letter went to Ms. Goins, you yourself
12   would decide which letter should go to her?
13        A.   We use several different techniques to
14   decide -- I use several different techniques to decide
15   which letters go to whom.  So I am not sure if I
16   answered your question, but if I haven't, you will have
17   to ask me a different question so I can be more
18   specific.
19        Q.   If JBC were sending a letter to Ms. Goins --
20        A.   So we are going to be -- we are going to now
21   hypothecate something, right?  We are going to say that
22   something exists that doesn't?
23        Q.   We are going to say, how does it get produced.
24   How do you decide which letter goes to Ms. Goins, who
25   lives in Connecticut?  What are the factors?
```

SANDERS, GALE & RUSSELL                              (203) 624-4157

GOINS v. JBC                                             January 27, 2004

Page 38

1     A    Let's -- I don't like hypotheses, but we will
2  do what you want. Are you asking me what letters went
3  to Miss Goins when her account was introduced into our
4  system.
5     Q    No, I am asking generally.
6     A    Depends on a number of factors.
7     Q    That is what I am asking. What factors; her
8  residence, the creditor, the debt? What factors?
9     A    Of course. The question is what type of --
10 where did the debt originate, in what transaction, in
11 what form. Was it an involuntary credit extension, such
12 as a check? What is the location of that individual?
13 What is the amount of the check, the date of the check,
14 the creditor itself, the original point of sale
15 creditor? Has there been any payments made against that
16 account, at what time? Do we have any reason to believe
17 that it was a fraudulent transaction, occurring by
18 someone other than the named debtor?
19          Has there been a bankruptcy filed? Has there
20 been any reason to believe that the transaction occurred
21 outside of the state, and therefore, applicable to other
22 statutes? What was her last communication with our
23 office? Are there other accounts on our system that
24 relate to that debtor with the same demographic
25 information? Those would be some.

SANDERS, GALE & RUSSELL                              (203) 624-4157

GOINS v. JBC                                            January 27, 2004

Page 39

```
 1        Q.   Are those factors built into the system or is
 2   it something you decide per case?
 3        A    Both.
 4        Q    Is --
 5        A    Or maybe the answer is either.
 6        Q.   Are your collectors allowed to generate or
 7   decide what letters go out?
 8        A    No.
 9        Q    Who other than you decides what letters go
10   out?
11        A    No one.
12        Q    Do you decide the -- I presume the letters
13   have variables.  Do you decide what variables go in?
14        A    I have just named those.
15        Q.   No, into the letter itself, into the body of
16   the letter?
17        A.   Well, that would lead to a different -- I
18   think you are asking me, did I draft a letter, because
19   the variables are what they are with respect to each
20   named debtor, right?  Are you asking me did I formulate
21   the letters as to what fields should go in there?
22   Right?
23        Q    Okay.
24        A    The answer is yes.  I have been involved.  To
25   most of the degree, I make the final decision on what
```

GOINS v. JBC                                              January 27, 2004

Page 40

1  letters are sent out and what they contain.
2      Q.   How many hours a week do you spend at JBC?
3      A.   Too many.
4      Q    Which means 10, 50?  What does it mean?
5      A.   I have never really taken account.  I work
6  from my home as well as from the office as well as from
7  the various offices around the country.  So I couldn't
8  answer that question fairly.
9      Q.   Is there a person named G. Strit, S-T-R-I-T,
10 at ROA Hutton?
11     A    Again --
12          MR. FIANO: Object to the form.
13     A.   Or the relevance, really?  I mean, come on.
14     Q    It is a "yes" or "no" question.
15     A.   No, there is not.
16     Q.   Who uses that e-mail address?
17     A.   I don't know.  I don't know.
18     Q.   Do you have something called a Check Recovery
19 Program?
20     A.   You just went from ROA Hutton on to me in your
21 question.  Are you asking me personally?
22     Q.   I am asking JBC.  You are the president.  You
23 are the boss.  You know what goes on there.
24     A.   That is fine.  You just went from ROA Hutton
25 to "you."

SANDERS, GALE & RUSSELL                              (203) 624-4157